LOCAL 512, WAREHOUSE AND OF-FICE WORKERS' UNION, International Ladies' Garment Workers' Union AFL–CIO, et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

FELBRO, INC., Respondent.

Nos. 85–7281, 85–7355.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 1986.

Decided July 22, 1986.

Norman Kirshman, Kirshman & Harris, Los Angeles, Cal., Michael Rubin, Altshuler & Berzon, San Francisco, Cal., for petitioners.

Norman Bernstein, N.L.R.B., Washington, D.C., for respondent.

Before PREGERSON and BEEZER, Circuit Judges, and JAMESON,* Senior United States District Judge.

PREGERSON, Circuit Judge.

The National Labor Relations Board ("NLRB" or "Board") found that Felbro, Inc. had violated the National Labor Relations Act ("NLRA") by laying off certain workers and refusing to execute a collective bargaining agreement negotiated with Local 512, Warehouse and Office Workers' Union ("Local 512"). Many of Felbro's employees are undocumented alien workers. Relying on its reading of *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), the NLRB conditioned its backpay order on proof at the compliance hearing that the workers whose labor law rights Felbro had violated ("discriminatees") are legally entitled to work in the United States. The NLRB petitions to enforce its order. Local 512 petitions for

---

* Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

review of the conditional remedy ordered by the NLRB. Felbro contests parts of both the liability and remedy sections of the order.

Substantial evidence in the record supports the NLRB's findings that Felbro violated the NLRA, and thus we enforce the liability portion of the NLRB's order. However, we also conclude that the NLRB's decision to condition Felbro's payment of backpay upon proof of each discriminated worker's legal status in the United States is inconsistent with both the NLRA and the immigration laws. For this reason, we deny enforcement of the remedy portion of the order and remand the order to the Board for appropriate modification.

## FACTS

Felbro manufactures wire and tubular displays in South Gate, California. On August 5, 1981, Felbro's employees elected Local 512 as their bargaining agent in an NLRB-supervised election.

■ In a series of incidents immediately before and in the months after the election, Felbro supervisors changed working practices and laid off certain employees in ways that an Administrative Law Judge ("ALJ")

found constituted several violations of sections 8(a)(1) and 8(a)(3) of the NLRA. The ALJ also found two violations by Felbro of both sections 8(a)(5) and 8(a)(1) of the NLRA.[1] First, in the period between the union election and the NLRB's certification of the result, Felbro temporarily laid off three employees without notifying Local 512 or giving it an opportunity to bargain over the layoff. Second, after extended discussions, negotiators for Felbro and Local 512 agreed on the terms of a three-year collective bargaining agreement, subject to ratification by the members of the bargaining unit. The ALJ found that the employees ratified the contract. Felbro contests the validity of the ratification, and asserts that, in any event, it repudiated the contract offer before Local 512 notified Felbro of the ratification. Felbro refused to execute the contract. The ALJ found this refusal a violation of section 8(a)(5). The Board affirmed the ALJ's conclusions with some modification. 274 N.L.R.B. No. 186 (Mar. 29, 1985). Felbro opposes only the finding of the two section 8(a)(5) violations.

Felbro reinstated all the laid-off employees before the ALJ's hearing. The discriminatees are all presently in the United States working for Felbro. As far as the record shows, no Felbro employee has been

1. Section 8(a) of the NLRA, 29 U.S.C. § 158(a), states in part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

. . . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

On appeal, Felbro contests only the two section 8(a)(5) and the corresponding 8(a)(1) violations. Consequently, the portion of the Board's order referring to the other sections 8(a)(1) and 8(a)(3) violations, insofar as it concerns Felbro's liability, is entitled to summary enforcement. *See NLRB v. Nevis Industries, Inc.,* 647 F.2d 905, 908 (9th Cir.1981).

The Board found that Felbro violated section 8(a)(1) by: telling employees that some were being laid off because the union had won the election; telling employees that interdepartmental transfers would be discontinued because the employees had sought union protection; threatening employees with reprisals because of protected union activities; and informing an employee that the company was ending negotiations with Local 512. The Board found that Felbro violated both sections 8(a)(1) and 8(a)(3) by discontinuing its previous practice of temporary interdepartmental transfer and laying off employees because of their union activities.

The ALJ also found that Felbro violated section 8(a)(1) by laying off for one day five employees who protested the non-discriminatory layoff of another employee. The NLRB rejected this finding of the ALJ, concluding that the layoff was a legitimate disciplinary response by Felbro to the five employees' refusal to work. Local 512 does not contest on appeal this modification of the ALJ's findings.

the subject of any INS deportation proceeding.

The ALJ recommended that the traditional NLRB remedy of reinstatement and backpay be afforded to those employees specifically discriminated against by Felbro, and that Felbro be required to implement retroactively the agreed collective bargaining agreement and to reimburse its employees for any loss in pay or benefits caused by Felbro's belated implementation of the contract's terms. The NLRB affirmed the ALJ's recommended remedy with respect to the two section 8(a)(5) violations, but amended the proposed remedy for the section 8(a)(1) and 8(a)(3) violations. In his opinion, the ALJ noted that several of the discriminatees were undocumented workers, and permitted them to testify under assumed names and to refuse to answer questions relating to their immigration status. Amending the ALJ's remedial order, the NLRB stated:

> Subsequent to the issuance of the [ALJ's] decision, the Supreme Court issued its decision in *Sure-Tan, Inc. v. NLRB*, [467 U.S. 883], 104 S.Ct. 2803 [81 L.Ed.2d 732] (1984), in which it held, inter alia, that while undocumented alien workers are employees entitled to the Act's protection, "in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefor[e] tolled) during any period when they were not lawfully entitled to be present and employed in the United States." Because it appears that a number of the employees affected by the backpay order herein were undocumented aliens, we shall leave to the compliance stage the issue of the employees' entitlement to backpay consistent with the requirements of the Court's opinion in *Sure-Tan*.

274 N.L.R.B. No. 186, slip op. at 5.

Local 512 timely petitioned for review of the conditional terms in the remedy ordered by the NLRB. The NLRB timely cross-petitioned to enforce its order in its entirety. The Mexican-American Legal Defense and Educational Fund ("MALDEF") has filed a brief amicus curiae in support of Local 512.

## STANDARD OF REVIEW

We will enforce an NLRB order if it correctly applies the law *and* its factual findings are supported by substantial evidence in the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *US Ecology, Inc. v. NLRB*, 772 F.2d 1478, 1480 (9th Cir.1985).

The NLRB has broad discretion in fashioning remedies that will "effectuate the policies" of the National Labor Relations Act. *See NLRB v. J.H. Rutter-Rex Manufacturing Co.*, 396 U.S. 258, 262–63, 90 S.Ct. 417, 419–20, 24 L.Ed.2d 405 (1969). We will defer to the NLRB's broad authority to construe the NLRA unless the NLRB's decision is "irrational or inconsistent with the Act." *NLRB v. Financial Institution Employees of America, Local 1182*, —— U.S. ——, 106 S.Ct. 1007, 1013, 89 L.Ed.2d 151 (1986). However, we must not allow our deference to the NLRB "to slip into a judicial inertia which results in the unauthorized assumption ... of major policy decisions properly made by Congress.'" *Id.* (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)).

## DISCUSSION

### SECTION 8(a)(5) VIOLATIONS

I. *Felbro's Failure to Bargain Over the Layoffs.*

On August 22 or 24, 1981, Felbro laid off employees Armando Castaneda, Ramirez, and Santizo. The layoff was not discriminatory. However, Felbro did not notify Local 512 of its intention to lay off the three employees.

 An employer violates section 8(a)(5) of the NLRA when it institutes a material change in the terms and conditions of employment in an area that is a compulsory subject of collective bargaining without giving the bargaining agent both reasonable notice and an opportunity to nego-

tiate about the proposed change. *NLRB v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962); *NLRB v. Merrill & Ring, Inc.*, 731 F.2d 605, 608 (9th Cir.1984). A unilateral layoff by an employer violates section 8(a)(5). *See NLRB v. Carbonex Coal Co.*, 679 F.2d 200, 204 (10th Cir.1982); *cf. Peerless Roofing Co. v. NLRB*, 641 F.2d 734, 735 (9th Cir.1981) (unilateral change in pension provisions violates section 8(a)(5)). Such unilateral action violates section 8(a)(5) even when, as here, it occurs before the union's certification by the NLRB. *See Carbonex Coal*, 679 F.2d at 205 (citing cases).

■ Felbro asserts two defenses. First, Felbro argues that the union waived its right to bargain over the layoffs because it received advance notice from other sources and failed to request that Felbro bargain over that issue. Second, Felbro contends that the layoffs were consistent with Felbro's past practice, and thus cannot constitute a unilateral change. Neither defense is meritorious.

Felbro claims that "at least two employees" informed union steward Machuca about the layoffs. The record shows that employees Felipe Castaneda and Zacarias expressed "concerns" to Machuca that they "might" be laid off. Neither of these employees was in fact laid off by Felbro. Machuca was not informed of any *actual* layoffs until after they had occurred. "[M]ere suspicion or conjecture cannot take the place of notice where notice is required." *ILGWU v. NLRB*, 463 F.2d 907, 918 (D.C.Cir.1972); *see also NLRB v. Royal Plating and Polishing Co.*, 350 F.2d 191, 195 (3d Cir.1965) ("[P]lant gossip, conjecture and rumors cannot take the place of formal notice when notice is required."); *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170, 176 (2d Cir.1961) ("[C]onjecture or rumor is not an adequate substitute for an employer's formal notice.")[2]

■ Felbro also argues that it laid off the three employees in accordance with its established policy. Felbro relies on *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) and *Aaron Brothers Co. v. NLRB*, 661 F.2d 750 (9th Cir.1981). In *Katz*, the Court held that unilateral changes in working conditions would not violate section 8(a)(5) if they were "a mere continuation of the status quo." 369 U.S. at 746, 82 S.Ct. at 1113. The merit wage increases at issue in *Katz*, however, were unlawful because they were "in no sense automatic, but were informed by a large measure of discretion." *Id.* In *Aaron Brothers*, we emphasized that the "longstanding practice" exception suggested in *Katz* placed a heavy burden on the employer to show an absence of employer discretion in determining the size or nature of a unilateral employment change. 661 F.2d at 753. Economic layoffs would seem to be inherently discretionary, involving subjective judgments of timing, future business, productivity and reallocation of work. Thus, we doubt that the *Katz* exception can ever apply to an economic layoff.

Even if the *Katz* "longstanding practice" exception might apply to an economic layoff, it is inappropriate here. Felbro offers no evidence that work was "slow" at seasonally predictable times. Rather, the layoffs were unpredictably episodic. Moreover, Felbro's layoff procedure was *ad hoc* and highly discretionary: before layoff, decisions were made whether to transfer employees to a busier department, to implement a permanent or part-week layoff, and to follow seniority or other methods in selecting the employee to lay off. In any event, Felbro apparently disregarded this procedure for the three layoffs of Ramirez, Santizo, and Armando Castaneda: Felbro

---

**2.** Felbro relies heavily on *NLRB v. Henry Vogt Machine Co.*, 718 F.2d 802 (6th Cir.1983). In *Vogt*, the employer notified the union negotiating committee in advance that certain cafeteria privileges would be revoked. The Board found that the union *consciously* chose not to raise the issue to avoid dissension among members who had long been deprived of cafeteria benefits. 718 F.2d at 809. Local 512's inaction in response to the speculative innuendo of the communication to Machuca is clearly not comparable to the deliberate waiver by the union in *Vogt*.

had earlier abandoned interdepartmental transfers; Felbro made no effort to implement a reduced work week; and Felbro retained at least one employee who had less seniority and no greater skills than those employees it laid off.

## II. *Felbro's Failure to Execute the Collective Bargaining Agreement.*

Prior to contract negotiations, the negotiators—Felbro attorney Cohen and Local 512 agent Strongin—stipulated that any agreement would be binding only if it was both ratified by Felbro's employees and approved by Felbro. After several meetings, the negotiators agreed on terms. Felbro contends that it never approved the offer made by Cohen and that the employees never ratified the contract. The NLRB found that Felbro's employees ratified the contract on January 5, 1982. The ratification vote was communicated to Strongin who unsuccessfully attempted to notify Felbro by telephone. On January 7, Strongin mailed Felbro a letter confirming the ratification. Felbro further asserts that it revoked its offer by mailgram before Strongin mailed the ratification letter to Felbro. The NLRB found that Felbro's efforts to revoke the agreement after Cohen and Strongin had agreed to its terms were immaterial because the agreement's implementation depended only on the employees' ratification of the terms. Substantial evidence supports the Board's findings.

■ An employer violates section 8(a)(5) if he refuses to execute a collective bargaining agreement whose terms have been agreed by both parties. *See H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 523–26, 61 S.Ct. 320, 324–26, 85 L.Ed. 309 (1941); *NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 142 (9th Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976). Whether the parties have reached agreement is a factual question to be determined by the NLRB. *NLRB v. Strong Roofing and In-*

*sulating Co.*, 393 U.S. 357, 361, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969).

■ The negotiations between Cohen and Strongin spanned seven sessions. On November 16, 1981 Cohen submitted a thirteen-page draft contract. Cohen reaffirmed this proposal in the December 17 session and again by phone to Strongin on December 19. There is no evidence whatever to contradict the common-sense conclusion that Felbro approved the proposed terms.[3] Strongin accepted Felbro's terms in the December 19 phone conversation with Cohen and again by letter on December 23. In both these communications Strongin stated that the union would recommend acceptance but that the acceptance was subject to the employees' ratification. There is thus substantial evidence to support the Board's conclusion that the employees' ratification was the only condition to the execution of the contract as agreed.

■ The Board affirmed the ALJ's finding that Felbro's employees ratified the agreement. The ALJ heard the testimony of Local 512 agents Machuca and Zayas that seventeen employees attended a union meeting on January 5 and, in that meeting, ratified the contract. Both agents testified that they distributed leaflets advertising the ratification meeting, that a secret ballot was conducted at the meeting, and that most or all of those present voted for ratification. Felbro points to the testimony of a union witness, Montano, who stated that the election of officials was the only business conducted at the meeting. The ALJ did not expressly discredit Montano's testimony, but, in finding the ratification vote valid, he clearly credited the testimony of Machuca and Zayas. Credibility resolutions are the particular province of the ALJ, and we accord them "great deference," and will uphold them unless they are "inherently incredible or patently unreasonable." *Photo-Sonics, Inc. v. NLRB*, 678 F.2d 121, 123 (9th Cir.1982) (citing cases).

---

**3.** Strongin testified that Cohen had stated on December 19 that he had confirmed the offer with his client. Cohen did not testify.

It was reasonable for the ALJ to credit the mutually corroborative testimony of Machuca and Zayas.[4]

■ Finally, Felbro, citing California law and basic contract principles, claims that it revoked its offer on January 7 by delivering a mailgram to Strongin before Strongin mailed to Felbro notification of the ratification vote. We have observed that "technical rules of contract formation do not confine collective bargaining." *Presto Casting Co. v. NLRB*, 708 F.2d 495, 497–98 (9th Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983). Here, there is substantial evidence to support the NLRB's finding that any actions by Felbro after the December 19 agreement between Strongin and Cohen were immaterial. The ground rules established between Felbro and the union specified "ratification" as the critical act, not notification of the ratification vote. Even under traditional rules of contract law, the parties' own expressed intent would govern.

Thus, substantial evidence supports the Board's findings that Felbro violated sections 8(a)(5) and 8(a)(1) by failing to notify Local 512 of the three layoffs and by refusing to execute the agreed contract, and we affirm those findings.

## BACKPAY REMEDY

### I. *Court's Jurisdiction to Review the Board's Remedy*

As a threshold matter, the Board objects to the panel's review of the backpay reme-dy on two jurisdictional grounds. The Board argues: first, that appellate review is barred by section 10(e) of the NLRA; and second, that any review of the remedy should be delayed until the outcome of the Board's compliance hearing. We reject both arguments and thus reach the merits of the Board's backpay remedy.

### A. *Section 10(e) Objection*

Section 10(e) of the NLRA, 29 U.S.C. § 160(e), states, in pertinent part, that "No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." The NLRB based its amended backpay order on its interpretation of *Sure-Tan v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), which the Supreme Court decided after the ALJ's opinion here. Thus, the NLRB argues, since neither Felbro nor Local 512 filed a motion for reconsideration of the Board's amended backpay order, section 10(e) bars us, as an appellate court, from considering Local 512's and Felbro's opposition to the backpay order.

■ Congress enacted section 10(e) to ensure that the NLRB has an opportunity to apply its special expertise to an issue before that issue is presented to an appellate court. *See Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943) (per curiam); *NLRB v. Best Products Co.*, 765 F.2d 903, 909 (9th Cir.1985). Section 10(e) bars judicial re-

---

**4.** Felbro objects that the individual votes are hearsay and may not be admitted through the testimony of the tellers, Machuca and Zayas. *See* Fed.R.Evid. 801(c). The ballots were apparently destroyed after the meeting and could not be admitted into evidence.

This testimony was not hearsay as it was *not* "offered in evidence to prove the truth of the matter asserted." Rule 801(c). The testimony as to the individual ballots was offered solely to prove that such a vote was cast. We are not concerned with the "truth" of any matter expressed by the individual casting the ballot. The casting of a vote is a verbal act, in which the statement itself has legal effect.

As stated in the advisory committee notes on proposed Rule 801:

If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70 (7th Cir.1950), *rev'd on other grounds* 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 [1951], letters of complaint from customers offered as a reason for cancellation of dealer's franchise, to rebut contention that franchise was revoked for refusal to finance sales through affiliated finance company. The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

view when no objection has been filed, *see Woelke and Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982); *NLRB v. IBEW, Local 952*, 758 F.2d 436, 439–40 (9th Cir.1985), or when only an ambiguous, general objection to the decision has been filed, *see Marshall Field*, 318 U.S. at 255–56, 63 S.Ct. at 586; *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 349–50, 73 S.Ct. 287, 290–91, 97 L.Ed. 377 (1953). However, an objection will meet the statutory requirement if it is not " 'so ambiguous as to be totally ineffective to adequately apprise the Board' " that the issue is disputed. *Best*, 765 F.2d at 909 (quoting *NLRB v. Giustina Brothers Lumber Co.*, 253 F.2d 371, 374 (9th Cir.1958) ). Once an issue is raised before the NLRB, another party may litigate the issue on appeal. *See Consolidated Freightways v. NLRB*, 669 F.2d 790, 794–95 (D.C.Cir.1981).

■■■ Felbro's first affirmative defense to the General Counsel's complaint raised the issue whether undocumented workers were entitled to any remedy under the NLRA.[5] The ALJ explicitly rejected this defense in framing his recommended remedy.[6] Felbro excepted to the ALJ's remedy in its entirety and, in its supporting brief to the NLRB, argued at some length that the Board had no authority to order the payment of backpay to undocumented workers.[7] Felbro has thus adequately preserved the issue for judicial review. *See NLRB v. Wayne Transportation, a Division of Wayne Corp.*, 776 F.2d 745, 748–49 (7th Cir.1985) (change in law after ALJ decision does not require specific objection to preserve matter for appeal); *Universal Security Instruments, Inc. v. NLRB*, 649 F.2d 247, 260 (4th Cir.) (no motion for reconsideration needed to preserve for appeal general exception to backpay order based on new remedial theory), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *see also May Department Stores Co. v. NLRB*, 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 209, n. 5, 90 L.Ed. 145 (1945) (general objection sufficient to permit appeal to breadth of remedial order); *Hospital and Service Employees Union, Local 399 v. NLRB*, 743 F.2d 1417, 1425–26 (9th Cir.1984) (general exception to briefly discussed issue in NLRB order sufficient to preserve matter for appeal).

### B. *Administrative Exhaustion*

■■■ The NLRB also argues that it is premature for us to review its remedial order. The Board asserts that appellate review of the Board's proposed treatment

---

5. Felbro's affirmative defense stated:
 Respondent is informed and believes and upon that basis alleges that a substantial number of employees are residing and working in this country in violation of federal civil and criminal laws. Therefore, the National Labor Relations Board (the "Board") is without statutory authority to issue a remedial order in respect to such employees.

6. The ALJ stated:
 Most of the employee witnesses called by the General Counsel have used fictitious names while working for Respondent, apparently to protect their status as undocumented aliens. That status, of course, does not deprive them of protection under the Act, see *NLRB v. Apollo Tire Co.*, 604 F.2d 1180 (9th Cir.1979).
 ALJ's decision attached to 274 N.L.R.B. No. 186 at 3 n. 4.

7. Under the heading "THE ILLEGAL ALIEN ISSUE," Felbro's brief to the NLRB stated in part:
 This case illustrates the hypocrisy in utilizing polite terms such as "undocumented" to describe the status of persons whose very presence in this country, as well as day to day activities, constitute violations of federal law. . . .
 The issue is not whether an employer who arguendo may have engaged in conduct otherwise in violation of the Act should be insulated from the Board's remedial authority, but rather whether the protections of the Act and the overall scheme of federal law are to be used to aid and abet those who violate one federal statute by mere presence and will have no option other than to violate other federal laws in order to conceal that unlawful presence. Is the Board truly articulating federal policy when its processes are publicly pronounced to be available to any and all persons, so long as they can manage to enter the territorial [sic] limits of the United States, by any means, and can evade those who are charged with the duty of enforcing the laws broken in the course of reaching the protective haven of the Board?

of the discriminatees' back pay rights should await the litigation of these rights in a Board compliance hearing. The Board's Rules and Regulations provide generally for bifurcation of the liability and compliance phases of an unfair labor practice charge. *See 3 NLRB Casehandling Manual* §§ 10650, 10650.1. The employer may raise an affirmative defense, such as job elimination or failure to mitigate, at the compliance hearing, and the compliance decision is itself an appealable order. *See NLRB v. International Association of Bridge, Structural and Ornamental Ironworkers, Local 433*, 600 F.2d 770, 778–79 (9th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

The Board argues essentially for a doctrine of administrative exhaustion. The application of such a doctrine is not appropriate in the circumstances of this case. We have recognized that *factual* issues which relate to the details of the remedy should be delayed to the compliance hearing. *See e.g., NLRB v. Trident Seafoods Corp.*, 642 F.2d 1148, 1150 (9th Cir.1981) ("[Q]uestions relating to the exact amount of back pay owing ... are prematurely raised in this enforcement petition. Those issues [of backpay, mitigation and job elimination] may be explored in a compliance proceeding.") (quoting *Great Chinese American Sewing Co. v. NLRB*, 578 F.2d 251, 255–56 (9th Cir.1978)). However, no exhaustion is required where the challenge on review is to the underlying *legal* basis of the Board's remedial order. *See e.g., Sure-Tan*, 467 U.S. at 898–905, 104 S.Ct. at 2812–16 (reviewing, prior to compliance, Board's decision to award six months backpay to workers outside country and unable to re-enter); *Seven-Up*, 344 U.S. at 346–48, 73 S.Ct. at 287 (reviewing, prior to compliance, Board's determination that computed remedy should discount certain earnings); *NLRB v. Gullett Gin Co.*, 340 U.S. 361,

362–64, 71 S.Ct. 337, 338–40, 95 L.Ed. 337 (1951) (reviewing, prior to compliance, Board's determination that unemployment benefits should be disregarded in computing backpay).

We therefore reject both of the NLRB's jurisdictional arguments and reach the merits of the Board's conditional backpay remedy.

## II. *The Sure-Tan Decision*

### A.

In *Sure-Tan*, the employees of two small leather processing firms in Chicago elected Local 431, Chicago Leather Workers Union, as their bargaining agent. Most of the employees were undocumented workers. 467 U.S. at 886, 104 S.Ct. at 2806. The Board rejected the employer's contention that illegal aliens were not entitled to the protection of the NLRA.[8] The next day, Sure-Tan wrote to the INS requesting that the alien status of certain employees be checked at once. INS agents visited the workplace and arrested five Sure-Tan employees as illegal aliens. That day, each of the five arrested employees voluntarily signed an INS document acknowledging their illegal presence in the United States and accepting voluntary departure in lieu of deportation. Later that same day, all five departed for Mexico. *Id.* at 887, 104 S.Ct. at 2806.

The NLRB upheld the union's unfair labor practice charges against Sure-Tan, finding that notifying the INS in these circumstances constituted a retaliatory constructive discharge for the exercise of federally protected rights. The ALJ in *Sure-Tan* had recommended reinstatement, with the offer to be kept open for six months. However, the ALJ refused to award backpay, relying on the Board's doctrine of tolling backpay for any period·when a discriminatee is not available for work.[9] The Board amended the ALJ's proposed reme-

---

**8.** This determination reflected the NLRB's long-standing view that undocumented alien workers were "employees" within the meaning of section 2(3) of the NLRA, 29 U.S.C. § 152(3). *See Sure-Tan*, 467 U.S. at 891 n. 5, 104 S.Ct. at 2808 n. 5; *NLRB v. Apollo Tire Co.*, 604 F.2d 1180, 1182

(9th Cir.1979); *Amay's Bakery & Noodle Co.*, 227 N.L.R.B. 214, 214 (1976).

**9.** *See e.g., Gifford-Hill & Co.*, 188 N.L.R.B. 337, 338 (1971) (no backpay available to incarcerated discriminatee); *American Manufacturing*

dy, ordering reinstatement and backpay with the issue of unavailability to be deferred until compliance. The Seventh Circuit enforced the Board's order, but proposed modifications to the remedy: reinstatement could only be proper if the discriminatees had legally re-entered the United States; the reinstatement offers should remain open for four years; and the Board should consider imposing a six-month minimum backpay award to effectuate the Act's policies even though the discriminatees were unavailable to work during this period. *Id.* at 887–90, 104 S.Ct. at 2806–08. The Board subsequently adopted the Seventh Circuit's proposed modifications. *Id.* at 890, 104 S.Ct. at 2808.

The Supreme Court affirmed in part and reversed in part. Finding no conflict between the NLRA and the Immigration and Nationality Act ("INA"), the Court accepted that "the provisions of the NLRA are applicable to undocumented alien employees." *Id.* at 894. However, the Court refused to enforce the modified remedy.[10] The six-month backpay award was based on "pure speculation and does not comport with the general reparative policies of the NLRA." *Id.* at 901, 104 S.Ct. at 2814. The award was "not sufficiently tailored to the actual, compensable injuries suffered by the discharged employees." *Id.* The Court noted that the NLRB could not ignore the INA, and approved the conditioning of reinstatement "upon the employees' legal readmittance to the United States." *Id.* at 903, 104 S.Ct. at 2815.

By conditioning the offers of reinstatement on the employees' legal reentry, a

potential conflict with the INA is thus avoided. Similarly, in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States.

*Id.*

In its remedial order here in Felbro's case, the NLRB interpreted this last statement by the Court to mean that an undocumented alien worker would *never* be entitled to backpay, and required the compliance officer to determine the legality of each discriminatee's presence in the United States.[11] Local 512, supported by amicus MALDEF, argues that *Sure-Tan* bars NLRA remedies only to undocumented workers who are unavailable to work because they are outside the United States with no prospect of legal reentry. Felbro endorses the Board's reading of *Sure-Tan*, but argues that the Board erred in limiting the conditional award to the five employees against whom Felbro committed section 8(a)(1) and 8(a)(3) violations. Felbro argues that the conditional remedy should apply also to the victims of the two section 8(a)(5) violations: the three workers laid off without notice to the union, and the entire workforce (over sixty people) benefitting from retroactive application of the unexecuted contract.

### B.

In *Sure-Tan*, the Court gave no indication that it was addressing any backpay

Co., 167 N.L.R.B. 520, 522 (1967) (no backpay for certain periods of illness or accident incurred in interim employment); 3 *NLRB Casehandling Manual* §§ 10612, 10656.9.

**10.** The Court in *Sure-Tan* split three ways. Justice O'Connor, writing for herself, the Chief Justice, and Justice White, held that the NLRA protected undocumented workers, but rejected the Board's proposed remedy. Justice Powell, joined by Justice Rehnquist, construed the NLRA to exclude undocumented workers. 467 U.S. at 913, 104 S.Ct. at 2820. However, Justices Powell and Rehnquist stated a preference for the more limited remedy proposed by Justice O'Connor. *Id.* Justice Brennan, writing for

himself, Justice Marshall, Justice Blackmun and Justice Stevens, agreed with Justice O'Connor that the NLRA protects undocumented workers, *id.* at 906, 104 S.Ct. at 2816, but would have upheld the six-month backpay remedy. *Id.* at 908–09, 104 S.Ct. at 2817–18. There was thus a majority of 7–2 upholding the liability portion of the NLRB's order, and a majority of 5–4 refusing to uphold the proposed remedy.

**11.** The Board has ordered a similarly conditional backpay remedy to undocumented discriminatees in one subsequent case. *See Caamano Brothers,* 275 N.L.R.B. No. 38, slip op at 1 n. 1 (1985).

issue wider than the six-month minimum backpay award made to the five *Sure-Tan* discriminatees who had left the United States. The five *Sure-Tan* discriminatees were clearly not available for employment at Sure-Tan for the period between their constructive discharges and the Board's order of reinstatement. They all agreed to voluntary departure on the day Sure-Tan committed the unfair labor practice, and were in Mexico throughout the backpay period without any indication in the record when they might legally *reenter* the United States to be reinstated as Sure-Tan employees. Thus, *Sure-Tan* does not address the question whether an undocumented worker who *remains* in the United States, and who has *not* been the subject of any INS deportation proceedings, is barred from receiving backpay to remedy an NLRA violation. *Cf. Bevles Co. v. Teamsters Local 986*, 791 F.2d 1391, 1393-94 (9th Cir.1986) (*Sure-Tan* does not bar arbitrator's award to undocumented workers who "have not been subject to any INS proceedings.").

The thrust of Justice O'Connor's opinion is directed at the speculative nature of the Board's remedy in *Sure-Tan*. *See* 467 U.S. at 900, 104 S.Ct. at 2813 ("a backpay remedy must be sufficiently tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices.") (emphasis in original); *id.* at 901 (award "not sufficiently tailored to the actual, compensable injuries suffered by the discharged employees."); *id.* (award "constitutes pure speculation"); *id.* at 904, 104 S.Ct. at 2816 (Board cannot "impose a minimum backpay award without regard to the employees' actual economic losses or legal availability for work."). The Board's award in *Sure-Tan* was speculative because the discriminatees were indefinitely unavailable for work. However, Justice O'Connor's opinion also implies that backpay *would* have been available to the *Sure-Tan* discriminatees had they not left the United States at the INS' behest, *notwithstanding* their status as undocumented workers:

> In the instant case, the Court of Appeals "estimated" an appropriate period of backpay without any evidence whatsoever as to the period of time these particular employees might have continued working before apprehension by the INS and without affording petitioners [Sure-Tan] any opportunity to provide mitigating evidence. In the absence of relevant factual information or adequate analysis, it is inappropriate for us to conclude, as does Justice Brennan [in his dissent in *Sure-Tan* ], that the Court of Appeals had estimated the proper minimum backpay award "with a fair degree of precision."

*Id.* at 902 n. 11, 104 S.Ct. at 2814 n. 11.

Unlike the five *Sure-Tan* employees, the Felbro discriminatees' lost wages can be determined precisely. The *Sure-Tan* discriminatees left for Mexico on the day of the unfair labor practice. The laid-off Felbro discriminatees have all returned to work at Felbro. The Felbro bargaining unit members (about sixty people) who will benefit from retroactive application of the unexecuted contract have worked at Felbro continuously throughout the backpay period. In contrast to the *Sure-Tan* discriminatees, the Felbro discriminatees' wage loss is easily and accurately calculated by multiplying the loss per day per employee by the number of days in the backpay period. The backpay owing here is thus "actual," not "speculative." Thus, *Sure-Tan* does not control the backpay award for the Felbro discriminatees.

## III. *Backpay Awards to Undocumented Workers and the NLRA*

The Supreme Court in *Sure-Tan* gave no indication that it was overruling a significant line of precedent that disregards a discriminatee's *legal status*, as opposed to *availability to work*, in determining his or her eligibility for backpay.

For example, in *NLRB v. Apollo Tire Co.*, 604 F.2d 1180 (9th Cir.1979), the Board found that six allegedly undocumented workers had been laid off in retaliation for complaining about the non-payment of overtime. The Board ordered the employ-

ees to be reinstated with backpay. 236 N.L.R.B. 1627, 1628 (1978). We enforced the Board's order in its entirety. 604 F.2d at 1182–84. We wrote:

> *Furthermore, we hesitate to require the Board to delve into immigration matters, out of its field of expertise.* Questions concerning the status of an alien and the validity of his papers are matters properly before the Immigration and Naturalization Service. An employer who suspects that an employee is in the United States without proper authority should report this information to the INS. Our holding merely insures that an employer is not permitted to commit unfair labor practices in the knowledge that the Board is powerless to remedy them.

*Id.* at 1183. (emphasis added) *See also Amay's Bakery & Noodle Co.,* 227 N.L.R.B. 214, 214–15 (1976) (reinstatement and backpay awarded to undocumented discriminatees); *Justrite Manufacturing Co.,* 238 N.L.R.B. 57, 65–68 (1978) (underage discriminatee entitled to backpay); *New Foodland, Inc.,* 205 N.L.R.B. 418, 420–21 (1973) (same); *The Embers,* 157 N.L.R.B. 627, 631 (1966) (same), *enf'd,* 64 L.R.R.M. (BNA) 2681 (5th Cir.1967); *Local 57, International Union of Operating Engineers,* 108 N.L.R.B. 1225, 1227–28 (1954) (engineer discriminatee without valid state license awarded backpay); *Robinson Freight Lines, Inc.,* 129 N.L.R.B. 1040, 1042 (1960) (truck driver discriminatee awarded backpay despite no valid driver's license).[12]

The NLRB routinely awards backpay to restore discriminatees to the economic position they would have enjoyed absent the unfair labor practice. *See Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 188–89, 94 S.Ct. 414, 427, 38 L.Ed.2d 388 (1973); *Rutter-Rex,* 396 U.S. at 263, 90 S.Ct. at 420; *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 197, 61 S.Ct. 845, 853, 85 L.Ed. 1271 (1941). Backpay awards also achieve a public purpose by deterring future similar unlawful practices, and by depriving employers of any competitive advantage they may have secured by acting unlawfully. *See Nathanson v. NLRB,* 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23 (1952); *NLRB v. United Marine Division,* 417 F.2d 865, 868 (2d Cir.1969), *cert. denied,* 397 U.S. 1008, 90 S.Ct. 1237, 25 L.Ed.2d 421 (1970). In *Apollo Tire,* we noted that denying an NLRA remedy to undocumented workers subverts the broad remedial goals of the NLRA. 604 F.2d at 1183.

The remedy proposed here by the Board leaves undocumented discriminatees without compensation. Admittedly, employers who violated Board cease and desist orders

---

**12.** Undocumented workers are entitled to backpay for violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq. See Brennan v. El San Trading Corp.,* 73 Lab.Cas. (CCH) ¶ 33032 at 46362 (W.D.Tex.1973); *Alvarez v. Sanchez,* 105 A.D.2d 1114, 482 N.Y.S.2d 184, 195 (1984). Undocumented workers have recovered unpaid wages in state actions for breach of an employment contract. *See Gates v. Rivers Construction Co.,* 515 P.2d 1020, 1021–22 (Alaska 1973); *Nizamuddowlah v. Bengal Cabaret, Inc.,* 69 A.D.2d 875, 415 N.Y.S.2d 685, 686 (1979). Wage loss by undocumented workers due to on-the-job injuries is compensable. *See Hagl v. Jacob Stern & Sons, Inc.,* 396 F.Supp. 779, 784–85 (E.D.Pa. 1975). Undocumented workers are entitled to lost wages as part of a tort recovery, *see Peterson v. Neme,* 222 Va. 477, 281 S.E.2d 869, 871–72 (1981), and to damages generally for personal injuries, *see Arteaga v. Literski,* 83 Wis.2d 128, 265 N.W.2d 148, 150 (1978); for wrongful death, *see Torres v. Sierra,* 89 N.M. 441, 553 P.2d 721, 724 (Ct.App.1976); and for breach of a sale contract, *see Moreau v. Oppenheim,* 663 F.2d 1300, 1307 (5th Cir.1981), *cert. denied* 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982). *See also Hurtado v. United States,* 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973) (illegal aliens held as witnesses for trial entitled to full per diem expenses); *Plyler v. Doe,* 457 U.S. 202, 210–15, 102 S.Ct. 2382, 2391–94, 72 L.Ed.2d 786 (1982) (illegal aliens entitled to broad range of constitutional protections); *United States v. Otherson,* 637 F.2d 1276, 1279–85 (9th Cir.1980) (civil rights' laws protect illegal aliens), *cert. denied,* 454 U.S. 840, 102 S.Ct. 149, 70 L.Ed.2d 123 (1981); *Cabral v. State Board of Control,* 112 Cal.App.3d 1012, 1015–17, 169 Cal.Rptr. 604, 606–07 (1980) (illegal alien entitled to compensation under state crime victims' statute); *Dermegerdich v. Rank,* 151 Cal.App.3d 848, 851–52, 199 Cal.Rptr. 30, 32–33 (1984) (illegal alien entitled to state health benefits); *Ayala v. California Unemployment Insurance Appeals Board,* 54 Cal. App.3d 676, 680, 126 Cal.Rptr. 210, 213 (1976) (undocumented worker entitled to state disability benefits).

would risk contempt penalties, *see Sure-Tan,* 467 U.S. at 904 n. 13, 104 S.Ct. at 2815 n. 13, but this risk would be slight. Contempt proceedings would require a further complaint from an undocumented employee who knew that filing a charge would immediately place his or her immigration status in jeopardy. Few undocumented workers would take such a chance. Moreover, the knowledge that deportation proceedings are a likely consequence of filing a successful unfair labor practice charge would chill severely the inclination of any unlawfully treated undocumented worker to vindicate his or her rights before the NLRB.

Additionally, the Board's proposed remedy encourages employers to continue to violate the NLRA. If employers know that they will incur no backpay liability, they will have less incentive to obey the NLRA. The victims of the Board's conditional remedy would be not only undocumented workers, but also American and documented alien workers. Unscrupulous employers would be encouraged to hire undocumented workers for the competitive advantage that an environment relatively free of labor safeguards may offer. "If an employer realizes that there will be no advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened." *Sure-Tan* 467 U.S. at 893, 104 S.Ct. at 2809. Congress intended to protect collective bargaining rights by ensuring that there is no "subclass of workers without a comparable stake in the collective goals of their legally resident co-workers, thereby eroding the unity of all the employees and impeding effective collective bargaining." *Id.* at 892, 104 S.Ct. at 2809. Thus, the Board's conditional backpay remedy proposed here is inconsistent with the goals of the NLRA.

IV. *Backpay Awards to Undocumented Workers and the INA*

A.

█ The *Sure-Tan* discriminatees were not entitled to backpay because they were all in Mexico without papers authorizing

them to reenter the United States legally, and thus they were unavailable for work during the backpay period. In *Sure-Tan,* the Court recognized that to treat the Sure-Tan discriminatees as available for work, as the six-month minimum backpay award implied, would undermine the Immigration and Nationality Act ("INA") by compensating aliens outside the United States for work they were unable to perform. 467 U.S. at 902–05, 104 S.Ct. at 2814–16. In contrast, the Felbro discriminatees are all in the United States presently working at Felbro. Thus, for the NLRB to award backpay to the Felbro discriminatees would not implicate the concerns expressed by the Supreme Court in *Sure-Tan.*

The employment of undocumented workers is "peripheral" to the INA. *Sure-Tan,* 467 U.S. at 892–93, 104 S.Ct. at 2809–10 (quoting *DeCanas v. Bica,* 424 U.S. 351, 360, 96 S.Ct. 933, 938, 47 L.Ed.2d 43 (1976); 8 U.S.C. § 1324(a)(3) ); *National Center for Immigrants' Rights v. INS,* 743 F.2d 1365, 1370 (9th Cir.1984). There is no provision "in the INA making it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization." *Sure-Tan,* 467 U.S. at 892–93, 104 S.Ct. at 2809–10; *see* 8 U.S.C. § 1324(a)(3). "Moreover, Congress has not made it a separate criminal offense for an alien to accept employment after entering this country illegally." *Sure-Tan,* 467 U.S. at 893, 104 S.Ct. at 2809.

The Court in *Sure-Tan* was not dealing with the employment of undocumented workers but was primarily concerned with the INA's prohibition against illegal entry into the United States. *Id.* at 902–04, 104 S.Ct. at 2814–15. "The central concern of the INA is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *De Canas,* 424 U.S. at 359, 96 S.Ct. at 938; *see also Bevles,* 791 F.2d 1393, 1394 (upholding arbitrator's award of reinstatement and backpay to undocumented workers). *See* 8 U.S.C. §§ 1325, 1326 (prohibiting illegal entry and reentry). Since the Felbro discriminatees remained in

the United States throughout the backpay period, an award of backpay to them would not impinge on this "central concern" of the INA.

Equally, we think it improbable that making backpay available to undocumented discriminatees who have continued to work during the backpay period will encourage illegal entry or reentry to the United States. Indeed, equalizing the backpay liability for unlawful acts against undocumented and American workers could deter employers from hiring undocumented workers and thus marginally reduce illegal entry to the United States.

**B.**

■ *Sure-Tan* also identified as two major goals of the INA the prevention of the loss of American workers' jobs and the protection of American workers' wage rates and working conditions. 467 U.S. at 893, 104 S.Ct. at 2809. *Cf. Pesikoff v. Secretary of Labor*, 501 F.2d 757, 761 (D.C. Cir.), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974); *see also* 8 U.S.C. §§ 1182(a)(14)(B) (aliens admitted to work only if admission "will not adversely affect the wages and working conditions of the workers in the United States similarly employed."). *Sure-Tan* noted that applying the NLRA's protections to undocumented workers increased the job opportunities of American workers because em-

ployers gained no economic advantage by hiring undocumented workers. 467 U.S. at 893, 104 S.Ct. at 2809. Since the Board's proposed remedy makes hiring undocumented workers more attractive to employers, it undermines two of the major goals of the INA.

**C.**

In *Apollo Tire*, we recognized that determining alien status is a matter peculiarly within the expertise of the INS. 604 F.2d at 1183. The Board's remedy here, however, places upon the NLRB compliance officer the responsibility for determining whether the discriminatee was "lawfully entitled to be present and employed in the United States" during the backpay period. Determining illegal alien status requires application of an intricate complex of statutory and regulatory provisions which an NLRB compliance officer is probably untrained to administer.

At oral argument, counsel for the NLRB candidly admitted that the Board "does not quite know" how a compliance officer would handle the immigration law questions sure to arise at the compliance stage of a conditional remedial order similar to that issued here. Counsel could give us no indication of the procedure the compliance officer would follow to implement such an order.[13]

---

**13.** The NLRB's Associate General Counsel has issued two memoranda of guidance to NLRB Regional Directors on administering conditional remedial awards to undocumented workers. Memoranda OM 85–57 (July 2, 1985), OM 85–89 (Oct. 4, 1985), *reprinted at* 120 L.R.R.M. 342 (Dec. 23, 1985). Board regional staff are advised to consider "evidence supplied by the employer, the discriminatee, and other sources, together with information received from the local office of INS.... If, however, the Region's inquiry does not lead to a clear resolution of the matter, then of course, it will be necessary to refer the issue to INS." OM 85–89 at 1.

Felbro draws our attention to the requirement that social security numbers be issued only to citizens and legal aliens, *see* 20 C.F.R. §§ 422.-104, 422.107, and observes that the NLRB should be capable of enforcing a similar requirement excluding undocumented workers from the remedial benefits of the NLRA. The analogy is not apposite.

First, the Social Security Act requires the Secretary of Health and Human Services to "take affirmative measures" which would ensure that undocumented aliens do not receive social security numbers. *See* 42 U.S.C. § 405(c)(2)(B)(i)(I). The NLRA contains no comparable provision authorizing the NLRB to take affirmative action which would exclude undocumented workers from the benefits available under the NLRA.

Second, to obtain a social security number an alien need only show that he or she is "permanently residing in the United States under color of law." *See* 20 C.F.R. § 416.1600(c). This may be established simply by proof of address, *see* 20 C.F.R. § 416.1603(a). *See also* 20 C.F.R. § 416.-1618. No proof of legal status—as required here by the NLRB—is necessarily required to obtain a social security number.

Third, the social security authorities may not pass any information that they obtain about any

Possession of the "green card" issued to aliens with permission to work in the United States is not necessarily conclusive evidence of legal presence. *See* 8 U.S.C. §§ 1251(a)(3), (4) (legal alien may be deported if institutionalized at public expense or convicted of crime of moral turpitude). Conversely, lack of documentation is not *prima facie* evidence of illegal entry. *See Gonzales v. City of Peoria*, 722 F.2d 468, 476–77 (9th Cir.1983); 8 C.F.R. § 212.1(f) (no documents required for admission in "unforseen emergency").

The federal immigration laws are exceedingly complex. *See Lok v. INS*, 548 F.2d 37, 38 (2d Cir.1977) (federal immigration laws bear "striking resemblance ... to ... King Minos' labyrinth in ancient Crete."). The INA enumerates thirty-three general categories of people who may not enter the United States. *See* 8 U.S.C. § 1182. Deportable persons can come from these or nineteen other categories. *See* 8 U.S.C. § 1251. Beyond this, the INA provides for many circumstances which prevent a "deportable alien" from actual deportation. *See* 8 U.S.C. § 1254 (petition to suspend deportation); 8 U.S.C. § 1158 (political asylum); 8 U.S.C. § 1255 (adjustment to lawful permanent resident status); INS O.I. § 242(a)(22) (deferred action status). Deportation cases may be reopened on petition to consider evidence previously unavailable, or an Immigration Judge or the Board of Immigration Appeals may reopen the case sua sponte. *See* 8 C.F.R. §§ 3.22, 242.22. A final administrative order of deportation can be stayed by the district director, 8 C.F.R. § 243.4, by a private bill in Congress, INS O.I. § 107.1, or if departure is "prejudicial to the interests of the United States," 8 C.F.R. § 215.3. All these determinations are appealable to the BIA, the Circuit Courts of Appeals and, potentially, to the Supreme Court. *See* 8 U.S.C. § 1105a(a) (review of deportation decisions may be had in federal appellate court); 8

C.F.R. § 3.1(b) (appellate jurisdiction of 314)..

Because of this skein of provisions,

[T]here is no assurance that a [person] subject to deportation will ever be deported. An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen. In light of the discretionary federal power to grant relief from deportation, [a governmental authority] cannot realistically determine that any particular undocumented [person] will in fact be deported until after deportation proceedings have been completed. It would of course be most difficult for the [governmental authority] to justify a denial of [a benefit] to a [person] enjoying an inchoate federal permission to remain.

*Plyler v. Doe*, 457 U.S. 202, 226, 102 S.Ct. 2382, 2399, 72 L.Ed.2d 786 (1982) (citations omitted). It is hard to believe that Congress wished to place upon an NLRB compliance officer, probably untrained in the intricacies of immigration law, the responsibility of determining the alien status of an undocumented worker and denying that person the benefit of the NLRA's remedies.

Additionally, we note that Congress has vested the Attorney General and the INS with exclusive responsibility to exercise discretion under the INA. *See generally,* 8 U.S.C. § 1103; 8 C.F.R. § 103.1; *see also* 8 U.S.C. § 1251(f)(1)(A) (waiver of deportation for fraudulent entry); 8 U.S.C. § 1254(a) (suspension in cases of extreme hardship); 8 C.F.R. § 208.8(a) (asylum); 8 C.F.R. § 236.1 (excludability). Because Congress has vested this discretion with the Attorney General, the Board probably lacks the authority to make immigration law determinations even to further its own statutory authority. *Cf. Local 1976, United Brotherhood of Carpenters and Joiners v. NLRB*, 357 U.S. 93, 110–11, 78 S.Ct. 1011, 1021–22, 2 L.Ed.2d 1186 (1958) (NLRB may not look to Interstate Commerce Act to determine whether carrier

individual to the INS. *See* 42 U.S.C. § 1306(a); *Alcaraz v. Block,* 746 F.2d 593, 603 (9th Cir. 1984). Thus while the Social Security Act pro-

tects against potential chilling effects resulting from discovery of illegal status, the scheme proposed by the NLRB affords no such protection.

violated hot cargo provisions of the NLRA); *See also Bevles*, at 1393 n. 3 ("NLRB determinations of issues involving the INA would be entitled to no deference."); *Apollo Tire*, 604 F.2d at 1183 ("Questions concerning the status of an alien and the validity of his papers are matters properly before the Immigration and Naturalization Service."); *Sure-Tan, Inc. and Surak Leather Co.*, 246 N.L.R.B. 788, 788 (1979), *modified* 672 F.2d 592 (7th Cir.1982), *aff'd in part, rev'd in part*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) ("We do not regard it as within our authority to alter the obligations imposed by the [NLRA] in a manner which might assist in reaching whatever may be the current goals of immigration policies, and we would be uncertain how to do so even if we considered it proper.").

## D.

There are significant procedural differences between deportation hearings and Board compliance proceedings. In compliance proceedings, the General Counsel may admit the employee's unavailability, *see* 3 *NLRB Casehandling Manual* § 10622, 10737.2; in a deportation proceeding the government must prove deportability by "clear, unequivocal, and convincing evidence." *Woodby v. INS*, 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966); *Sanchez-Martinez v. INS*, 714 F.2d 72, 74 (9th Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). Deportation proceedings also offer several procedural protections not available to discriminatees in NLRB compliance proceedings. *See* 8 C.F.R. §§ 242.1–242.16. The Board's determination of deportability may arguably be entitled to collateral estoppel effect in a subsequent INS deportation proceeding. *See United States v. Utah Construction and Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966) (factual determination of federal agency acting in judicial capacity entitled to preclusive effect). If this were so, the alien should be able to raise serious due process objections to the compliance proceeding. For this additional reason, it would be improvident to permit Board compliance officers to determine the immigration status of undocumented discriminatees.

## V. *Conclusion*

In *Sure-Tan*, the Supreme Court did not address the issue whether undocumented workers remaining at work in the United States throughout the backpay period are entitled to backpay awards. *Sure-Tan* barred from backpay only those undocumented workers who were unavailable for work in the backpay period because they were outside the United States without entry papers. Judicial and Board decisions, notably this court's *Apollo Tire* decision, recognize the right to backpay of undocumented discriminatees who are available for work in the United States. This recognition promotes the underlying aims of the NLRA and does not detract from the purposes of the INA. Moreover, the Board exceeds both its authority and its expertise in requiring its compliance officers to determine the immigration status of an individual discriminatee.

The NLRB's petition for enforcement is GRANTED IN PART and DENIED IN PART. Local 512's petition for review of the remedial section of the NLRB's order is GRANTED and that section of the order is REMANDED to the NLRB for modification consistent with this opinion.

BEEZER, Circuit Judge, dissenting in part:

I concur in that part of the majority opinion which holds that substantial evidence in the record supports the findings of the National Labor Relations Board ("NLRB" or "Board") that Felbro, Inc. engaged in unfair labor practices by laying off certain workers without engaging in bargaining with the union and by refusing to execute a collective bargaining agreement that had been negotiated. I also agree that we have proper jurisdiction to review the Board's backpay remedy.

However, I conclude that the Board's decision to condition the payment of backpay to layed-off workers upon proof of their legal immigration status is mandated by the Supreme Court's decision in *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984). Consequently, I dissent from the denial of enforcement of that remedy portion of the NLRB order.

## A. Background

All of the workers who had been layed-off by Felbro in violation of the labor laws have been reinstated with the company and are currently present in the United States. None of Felbro's alien employees is presently the subject of any Immigration and Naturalization Service ("INS") deportation proceeding. However, several of these aliens were admittedly undocumented. They testified under assumed names at the NLRB hearings and refused to answer questions concerning their immigration status.

Accordingly, the Board amended the remedial order to read:

Subsequent to the issuance of the [administrative law judge's] decision, the Supreme Court issued its decision in *Sure-Tan, Inc. v. NLRB*, [467 U.S. 883], 104 S.Ct. 2803 [81 L.Ed.2d 732] (1984), in which it held, inter alia, that while undocumented alien workers are employees entitled to the Act's protection, "in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefor[e] tolled) during any period when they were not lawfully entitled to be present and employed in the United States." Because it appears that a number of the employees affected by the backpay order herein were undocumented aliens, we shall leave to the compliance stage the issue of the employees' entitlement to backpay consistent with the requirements of the Court's opinion in *Sure-Tan*.

274 N.L.R.B. No. 186, slip op. at 5.

In sum, the NLRB concluded that the Supreme Court's decision in *Sure-Tan* restricted backpay awards to those alien employees who could demonstrate lawful presence and entitlement to work in the United States. This court now reverses the Board, by interpreting the *Sure-Tan* holding as narrowly applying to situations where the alien employee was not only unlawfully present in the United States but had actually been deported during the backpay period. I cannot agree with this strained interpretation.

## B. The Sure-Tan *Decision*

In *Sure-Tan, Inc. v. NLRB*, an employer had retaliated against undocumented alien employees who had engaged in union activities by reporting them to the INS. Agents of the INS arrested five of the employer's workers. Rather than face deportation proceedings, those alien employees accepted immediate voluntary departure to Mexico.

The Supreme Court upheld the NLRB's interpretation of the National Labor Relations Act ("NLRA") as applying to unfair labor practices committed against undocumented aliens. 467 U.S. at 891–94, 104 S.Ct. at 2808–10. The Court accepted the Board's longstanding view that undocumented alien workers are "employees" within the meaning of section 2(3) of the NLRA, 29 U.S.C. § 152(3). *Id.* at 891 & n. 5, 104 S.Ct. at 2808 & n. 5. Turning to the facts of the case, the Court held that the reporting of the undocumented workers to the INS had been a retaliatory constructive discharge for the exercise by the employees of federally protected rights to engage in concerted activities. Accordingly, the Court ruled that the employer's conduct constituted an unfair labor practice in violation of section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3). *Id.* at 894–98, 104 S.Ct. at 2810–12.

However, the Court limited the availability of individual remedies for the violation by saying that the departed alien employees could be reinstated only upon legal re-entry to the United States, and that "the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they

were not lawfully entitled to be present and employed in the United States." *Id.* at 903, 104 S.Ct. at 2815.

In the instant case, the NLRB interpreted this language quoted from *Sure-Tan* to mean that an alien worker discharged in violation of the NLRA is entitled to backpay *only* for the period during which he was lawfully present and entitled to work in the United States. Consequently, the Board's order indicated that each alien employee's immigration status must be ascertained during compliance proceedings before being granted backpay for the unlawful lay-off by Felbro.

The union instead contends, and the majority of this court today agrees, that the *Sure-Tan* decision should be narrowly limited to its specific factual context—where the aliens involved were unavailable for work because they had immediately departed the country and thus were physically outside the United States during the entire backpay period. The union argues that the Supreme Court's only concern in *Sure-Tan* was to overturn the decision of the Seventh Circuit, which had suggested an award of a minimum amount of backpay to the departed aliens by speculating that those aliens would have worked an average of six more months had the employer not reported them to the INS. *See* 672 F.2d 592, 606 (7th Cir.1982). In reversing the Seventh Circuit, the Supreme Court held that the NLRB and any reviewing court must consider whether the aliens were actually available for work and thus entitled to backpay for the period in question. 467 U.S. at 900–05, 104 S.Ct. at 2813–16. The union concludes that the Court was holding only that the workers must be physically available for work in order to be entitled to backpay, and thus backpay awards to undocumented aliens are tolled only if they are outside the United States during the backpay period.

The holding of the Supreme Court in *Sure-Tan* cannot be read so narrowly. The language used by the Court clearly indicates that individual remedies for labor law violations are to be limited to those aliens who can establish legal immigration status. The Court held that the backpay period is tolled unless the alien is *"lawfully entitled to be present and employed in the United States."* *Id.* at 903, 104 S.Ct. at 2815 (emphasis added). The Court did not limit its holding to situations where the alien has been physically removed from the United States through deportation or voluntary departure.

The Court held that the Seventh Circuit had erred in providing for a minimum amount of backpay because that court failed to take into account the alien employees' *"legal* availability for work" as well as any actual economic losses sustained. *Id.* at 904–05, 104 S.Ct. at 2815–16 (emphasis added). The Court acknowledged that it was uncertain whether any of the discharged employees could "establish at the compliance proceedings that they were *lawfully* available for employment during the backpay period." *Id.* at 904, 104 S.Ct. at 2815 (emphasis added).

This reference to *"legal* availability for work" and the query as to whether the aliens were *"lawfully* available for employment" further confirms the Court's intent that legal immigration status be a crucial relevant factor in determining whether backpay is tolled. The essence of the Court's ruling is that an alien worker is entitled to backpay for a lay-off or discharge in violation of the labor laws only when that alien has been legally present in the United States and authorized by the government to obtain employment during the backpay period.

It is instructive that Justice Brennan, dissenting from this holding, broadly interpreted the Court's decision as "restrict[ing] drastically the remedies available to undocumented alien employees." *Id.* at 912, 104 S.Ct. at 2819 (Brennan, J., concurring and dissenting in part). Justice Brennan went on to warn:

Once employers, such as petitioners, realize that they may violate the NLRA with respect to their undocumented aliens without fear of having to recompense those workers for lost backpay, their "in-

centive to hire such illegal aliens" will not decline, it will increase.

*Id.*

Justice Brennan plainly read the majority's holding as limiting the availability of backpay to all aliens without legal documentation, regardless of whether they had thus far escaped deportation. Commentators evaluating the *Sure-Tan* decision have likewise taken at face value the Court's express limitation of backpay to aliens lawfully entitled to be present and work in this country. *See, e.g.,* Comment, *Immigration Reform: Solving the "Problem" of the Illegal Alien in the American Workforce,* 7 Cardozo L.Rev. 223, 244 (1985) ("*Sure-Tan* mandates that illegal aliens do not receive the remedies granted their legal coworkers."); Bethel, *Recent Labor Law Decisions of the Supreme Court,* 45 Maryland L.Rev. 179, 196 (1986) ("[T]he effect of *Sure-Tan* is to deprive undocumented employees of any effective remedy for unlawful discrimination").

In sum, the Supreme Court in *Sure-Tan* held that, while the provisions of the NLRA apply to illegal alien "employees" in general terms to promote the public policies of the Act, the individual remedies normally provided for violations may not be available. The Court effectively directed the NLRB to take into account the individual circumstances of each employee, including his immigration status, in determining entitlement to individual awards of backpay or reinstatement. An undocumented alien is not entitled to such individual relief.[1]

The unstated premise behind this holding appears to be that an undocumented alien has not been legally harmed by a lay-off or termination. An alien who had no right to be present in this country at all, and consequently no right to employment, has not been harmed in a legal sense by the deprivation of employment to which he had no entitlement. It may promote the purpose of the NLRA to guarantee the collective bargaining rights of the NLRA to every employee, regardless of immigration status. But the award provisions of the NLRA are remedial, not punitive, in nature, and thus should be awarded only to those individuals who have truly suffered harm. Undocumented aliens, who often enter into the United States without inspection in violation of federal criminal law,[2]

---

1. The union has cited *Bevles Co. v. Teamsters Local 986,* 791 F.2d 1391 (9th Cir.1986), as additional authority for the proposition that *Sure-Tan* does not preclude an award of backpay to undocumented aliens still present in the United States.

In *Bevles,* this court upheld an arbitration award of reinstatement and backpay to undocumented aliens who had been discharged without just cause. The *Bevles Co.* opinion held that the *Sure-Tan* decision did not prohibit the arbitrator's remedy, notwithstanding the immigration status of the employees.

The *Bevles Co.* decision is distinguishable as it involved an arbitrator's interpretation of a collective bargaining agreement, rather than an NLRB application of federal labor law. "[T]his court's review of an arbitrator's interpretation of a collective bargaining agreement is much more limited than its review of a decision of the NLRB in a labor dispute." 791 F.2d at 1393 (footnote omitted). An arbitrator's award will not be vacated because of erroneous findings of fact or conclusions of law. *Id.* at 1392 n. 2; *American Postal Workers v. United States Postal Service,* 682 F.2d 1280, 1285 (9th Cir.1982), *cert. denied,* 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 43 (1983). Only an error by the arbitrator that contitutes a "manifest disregard of the law" will justify reversal of an award. *Bevles Co.* 791 F.2d at 1392 n. 2; *George Day Constr. Co. v. United Bhd. of Carpenters,* 722 F.2d 1471, 1477 (9th Cir.1984). Moreover, an employer may affirmatively agree through a bargaining agreement to make backpay payments that he would not be obligated by the labor laws to make.

To the extent that the *Bevles Co.* decision is precedent for our situation, or adds support to the majority's conclusions, I do not believe it can be reconciled with *Sure-Tan.* *See Bevles Co.,* 791 F.2d at 1394 (Sneed, J., dissenting).

2. Under 8 U.S.C. § 1325, any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection at the border, or (3) obtains entry by a willfully false or misleading representation or the willful concealment of a material fact, is guilty of a misdemeanor. *See United States v. Reyes-Oropesa,* 596 F.2d 399 (9th Cir.1979).

A subsequent unlawful entry by aliens into the United States or unlawful entry after deportation constitutes a felony. 8 U.S.C. §§ 1325, 1326.

are not harmed by removal from employment they could obtain only after such an unlawful entry and can retain only through continued unlawful presence.

The union argues that denial of awards of backpay to aliens unlawfully present in the United States would eliminate any incentive by an employer to obey the requirements of the NLRA, and thereby encourage unscrupulous employers to hire undocumented aliens. The union also contends that undocumented alien employees are unlikely to petition for redress of labor law grievances due to the lack of an effective remedy. The Supreme Court expressly rejected such an argument in *Sure-Tan* by noting that its decision—

> leaves intact the cease and desist order imposed by the Board, ... one of the Act's traditional remedies for discriminatory discharge cases. Were petitioners to engage in similar illegal conduct, they would be subject to contempt proceedings and penalties. This threat of contempt sanctions thereby provides a significant deterrent against future violations of the Act.

467 U.S. at 904 n. 13, 104 S.Ct. at 2815 n. 13. The Court further noted that if there remains "[a]ny perceived deficiencies in the NLRA's existing remedial arsenal," the proper solution lies with Congress and not the courts. *Id.* at 904 & n. 13, 104 S.Ct. at 2815 & n. 13.

### C. Consistency With Immigration Laws

The approach adopted by the Board in this case of limiting backpay awards to aliens "lawfully entitled to be present and employed in the United States" is entirely consistent with the immigration laws. Section 212(a)(14) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(14), provides for the exclusion from the country of aliens who seek skilled or unskilled employment without certification by the Secretary of Labor. This section thus creates "a presumption that aliens seeking employment are illegally present in the United States unless certified by the Secretary of Labor." Note, *The Alienation of American Labor: The National Labor Relations Act and the Regulation of Illegal Aliens,* 13 N.Y.U.J. Int'l L. & Pol. 961, 978 (1981).

For that reason, an alien who has entered the country and obtained employment contrary to section 212(a)(14) cannot complain when that employment is terminated. Moreover, it could be argued that permitting backpay awards to such aliens has the effect of sanctioning the continuing violation of the law engendered by the alien's very presence in this country. *See INS v. Lopez-Mendoza,* 468 U.S. 1032, ——, 104 S.Ct. 3479, 3490, 82 L.Ed.2d 778 (1984).

Although the union correctly points out that an undocumented alien may later have his status adjusted or be granted relief from deportation, that does not alter the fact that his presence is unlawful until such official relief is obtained. If an alien is without documentation, such as a grant of lawful permanent residence which constitutes federal permission to remain in this country, his status is unlawful.

By adopting this approach, the NLRB need not become enmeshed in immigration law nor will it be required to make difficult judgments of immigration status which are reserved to the expertise and discretion of the INS. If the alien is without documentation, his status is unlawful. In *Sure-Tan,* the Court used the terms "undocumented aliens" and "illegal aliens" interchangeably. Other agencies of the federal government withhold benefits from aliens without proper documentation[3] and this

---

3. For example, under the Social Security Act, 42 U.S.C. § 405(c)(2)(B)(i)(I), the Secretary of Health and Human Services is required to take affirmative measures to assure that social security numbers will be assigned only to aliens lawfully admitted and to aliens who may lawfully engage in employment.

Under the regulations, before an applicant is granted a social security number, there must be satisfactory proof of age, citizenship or alien status, and true identity. 20 C.F.R. § 422.107(a) (1985). The regulations also provide that a noncitizen shall not be assigned a number until it can be established that the person is not prohibited from engaging in employment in the United States or is procuring a number for nonwork purposes. *Id.* at § 422.104 to .107. An alien seeking to obtain a number may demonstrate

has not appreciably burdened those agencies nor deprived the INS of exclusive control over immigration law. Furthermore, the NLRB in its discretion may deem it appropriate to stay labor law compliance proceedings with regard to certain individual aliens until their status is conclusively determined in INS proceedings.

### D. Conclusion

Unquestionably, the Board's approach does add some complication to remedy compliance proceedings before the NLRB by introducing the element of legal immigration status to its considerations. In addition, denial of backpay and reinstatement awards to illegal aliens does withdraw some of the remedial bite of the labor laws against an unscrupulous employer. Indeed, it may well be that the majority opinion's approach is preferable as a matter of policy. But that approach simply cannot be reconciled with the Supreme Court's teaching in *Sure-Tan*. Such an alternative solution to the problematic interaction between federal labor and immigration laws will have to be requested from that Court or obtained through new legislation from Congress.

I respectfully dissent.

residence in the United States "under color of law" by presenting various specified forms of documentation from the INS. 20 C.F.R. § 416.-1618(a). If the alien cannot provide such documentation, the Social Security Administration will contact the INS to ascertain the alien's immigration status. 20 C.F.R. § 416.1618(b)(2). A social security number will not be granted to an applicant who presents "invalid or expired Immigration and Naturalization Service documents." *Id.* at § 422.107(e)(4).

It cannot seriously be contended that the NLRB is less able to examine and review INS documentation than is the Social Security Administration.

As a further example, under regulations enacted pursuant to 42 U.S.C. § 1302 of the Social Security Act, payment of certain federal welfare benefits is restricted to citizens and lawfully admitted aliens. 42 C.F.R. § 405.205 (1985).